UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JEROME L. WEINMANN and
SUSAN M. WEINMANN,

        Plaintiffs,

  v.                                    Case No.  13-C-0088

DEPUTY PATRICK MCCLONE and
WAUPACA COUNTY,

        Defendants.

## DECISION AND ORDER PARTIALLY GRANTING
## MOTION FOR SUMMARY JUDGMENT

       Plaintiffs Jerome and Susan Weinmann brought this action under 42 U.S.C. § 1983 for injuries sustained by them when Jerome was shot by Deputy Patrick McClone of the Waupaca County Sheriff's Department. Deputy McClone shot Jerome while responding to a call that Jerome had gone into his garage with a gun intending to shoot himself. The Weinmanns allege that Deputy McClone used excessive force against Weinmann in violation of his rights under the Fourth Amendment. They also allege that the County is liable because of its failure to implement a policy, procedure or protocol for deputies to follow when responding to calls involving individuals who may be suicidal. In addition to compensatory damages for the injuries caused by the shooting, the complaint also includes a claim for punitive damages. The case is before the Court on the defendants' motion for summary judgment. For the reasons that follow, the defendants' motion for summary judgment will be granted in part and denied in part.

## I. BACKGROUND

This case arises out of the non-fatal shooting of Plaintiff Jerome Weinmann by Defendant Deputy Patrick J. McClone of the Waupaca County Sheriff's Department. The parties agree on many of the facts that led up to the shooting inside Weinmann's garage. However, as will be explained below, there is a genuine issue of material fact as to whether Weinmann threatened Deputy McClone when he entered the garage so as to justify Deputy McClone's use of deadly force.

On November 12, 2007, Jerry and Susan Weinmann got into an argument. (Pls' Proposed Undisputed Fact (PPUF) ¶ 3, ECF No. 21.) Weinmann, who suffered from depression, became upset and went out to his detached garage. (*Id.* at ¶¶ 2–4.) In the garage, Weinmann had a conversation with his son about his unhappiness. (*Id.* at ¶¶ 6–7.) As a result of the conversation, his son "got the impression that his father might harm himself" and he went to a friend's house. (*Id.* at ¶ 9.)

After his son left, Weinmann had a conversation with his wife in the garage. (*Id.* at ¶¶ 10–11.) During this conversation, he informed his wife that he had told their son that he intended to kill himself. (Defs' Proposed Findings of Fact (DPFF) ¶ 4, ECF No. 18.) Like their son, she concluded that Weinmann was suicidal. (PPUF ¶ 11, ECF No. 21; DPFF ¶ 9, ECF No. 18.) She left the garage and called 911 to report that he was threatening to kill himself. (PPUF ¶ 12–14, ECF No. 21; DPFF ¶¶ 8–9, ECF No. 18.) She informed the dispatch operator, Shane Bazile, that Weinmann had access to a weapon—a "long gun"—but she did not know if he had any ammunition. (PPUF ¶ 13, 16, ECF No. 21; DPFF ¶ 8, 10, ECF No. 18.)

While Weinmann's wife was in the house calling 911, Weinmann retrieved his son's shotgun from a cabinet and loaded it with ammunition. (PPUF ¶ 19, ECF No. 21; DPFF ¶ 7, ECF

2

No. 18.) While sitting in a folding lawn chair, Weinmann put the muzzle of the shotgun in his mouth with the butt resting on the floor on at least two occasions. (PPUF ¶ 20, ECF No. 21; DPFF ¶ 15, ECF No. 18.) Unable to pull the trigger, Weinmann retrieved a bottle of vodka and drank half of it. (PPUF ¶ 21, ECF No. 21; DPFF ¶¶ 16–17, ECF No. 18.) When Weinmann did not have the muzzle in his mouth, he "rested it on the lawn chair armrests, holding it with his right hand on the stock and his left hand on the barrel." (DPFF ¶ 18, ECF No. 18.) Weinmann received two phone calls from the 911 dispatcher, but he refused to exit the garage or talk to the deputies. (DPFF ¶¶ 22–24, ECF No. 18.)

In response to the 911 call, Deputy McClone was dispatched to the residence. (DPFF ¶ 11, ECF No. 18.) The dispatcher informed Deputy McClone that Weinmann was in a garage, he had a gun, and was suicidal. (PPUF ¶ 18, ECF No. 21; DPFF ¶ 13, ECF No. 18.) The dispatcher also told Deputy McClone that it was not known if Weinmann had access to ammunition. (*Id.*) When Deputy McClone arrived at the scene, he made a visual inspection of the interior of the garage from two windows on the west side of the garage but was unable to see Weinmann. (DPFF ¶ 20, ECF No. 18; PPUF ¶ 29, ECF No. 21.) He did not look in any windows on the other sides of the garage. (PPUF ¶ 30, ECF No. 21.) However, he concluded that Weinmann was in the southwest corner of the garage because it was the only area he could not visualize from the windows on the west side. (DPFF ¶ 21, ECF No. 18; PPUF ¶ 29, ECF No. 21.) Deputy McClone also knocked on the door to the garage but received no response and did not attempt any verbal communication. (PPUF ¶¶ 27–28, ECF No. 21.) After learning that Weinmann refused to exit the garage and unable to visualize him, Deputy McClone decided to execute a "surprise" entry into the garage because he heard "pattering or light banging of cupboard doors" and concluded that "Weinmann was actively

attempting suicide." (PPUF ¶ 32, ECF No. 21.) Deputy Craig Copes, who served as backup, arrived just before Deputy McClone made the decision to enter the garage. (PPUF ¶ 26, ECF No. 21; DPFF ¶¶ 12, 28, ECF No. 18.)

The parties do not agree on what happened after Deputy McClone kicked in the door to the garage. In their motion, however, Defendants ask the Court to treat Weinmann's recollection regarding the location of the gun as undisputed. (Def. Br. 5 n.2, ECF No. 17.) According to Weinmann, "just before" Deputy McClone entered the garage, Weinmann leaned forward, lifted the gun, and banged it against his forehead. (DPFF ¶ 32–33, ECF No. 18.) The gun was around shoulder level when he hit it on his head. (*Id.* at ¶ 34.) Plaintiffs admit that this movement occurred, but that Weinmann "return[ed] the shotgun to its resting place" and, when Deputy McClone entered, Weinmann "was sitting in his chair with the shotgun across his lap resting on the wooden armrests or held just above them." (PPUF ¶¶ 24, 33, ECF No. 21.) Plaintiffs further claim that "he never pointed the gun at Deputy McClone, and he never did anything whatsoever to make Deupty McClone reasonably believe that the deputy or anyone else was in threat of harm." (*Id.* at ¶ 34.) Defendants admit that Weinmann never pointed the gun at Deputy McClone, but they maintain that "it is undisputed that Deputy McClone perceived the weapon as being pointed in his direction. Deputy McClone saw Weinmann holding a shotgun which appeared to be pointed at him." (Def. Resp. to PPUF 11, ECF No. 27.) Deputy McClone then discharged his weapon several times. (DPFF ¶ 38, ECF No. 18; PPUF ¶ 35, ECF No. 21.) Weinmann suffered wounds to his thumb, torso, and face. (PPUF ¶ 38, ECF No. 21.)

Waupaca County does not have a separate written policy for handling suicidal individuals. (PPUF ¶ 39, ECF No. 21.) Instead, "dealing with individuals with mental health issues is built into the use of force policy in terms of escalation of use of force." (DPFF ¶ 39, ECF No. 18.)

**II. Legal Standard**

A motion for summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Material" means that the factual dispute must be outcome-determinative under law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). A "genuine" issue must have specific and sufficient evidence that, were a jury to believe it, would support a verdict in the non-moving party's favor. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has the burden of showing there are no facts to support the non-moving party's claim. *Celotex*, 477 U.S. at 322. In determining whether to grant a motion for summary judgment, the court should consider the evidence presented in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. When the record, taken as a whole, could not lead a rational jury to find for the non-moving party, there is no genuine issue and therefore no reason to go to trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**III. Analysis**

Defendants move for summary judgment on all of Plaintiffs' claims. First, they argue that Deputy McClone's actions did not violate the Fourth Amendment. Even if his actions did violate the Fourth Amendment, they contend he is entitled to qualified immunity. Finally, Plaintiffs' claim against Waupaca County must be dismissed because there is no evidence that its lack of a specific policy regarding police interactions with suicidal individuals caused the use of force in this case.

### A. Excessive Force

Plaintiffs claim that Deputy McClone used excessive force against Jerome Weinmann in violation of his rights under the Fourth Amendment, which was made applicable to State actors through enactment of the Fourteenth Amendment. *Terry v. Ohio*, 392 U.S. 1, 8 (1968). The Supreme Court has held that all claims of excessive force are "analyzed under the Fourth Amendment and its 'reasonableness standard.'" *Graham v. Connor*, 490 U.S. 386, 395 (1989). The inquiry required to assess an excessive force claim under the Fourth Amendment involves "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (citations and quotation marks omitted). In applying the test of whether the force used was excessive, the court must consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

Further, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* In excessive force claims, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. Finally, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

6

Here, there is no question under *Garner* that the force used by Deputy McClone constitutes a seizure within the meaning of the Fourth Amendment. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."). Deputy McClone shot Weinmann in the hand, torso, and face. Weinmann's "fundamental interest in his own life need not be elaborated upon." *Id.* at 9.

The crucial issue is whether the facts of this case justified the use of deadly force. As a general matter, an officer may use deadly force if the officer has probable cause to believe that the suspect's actions place the officer or others in imminent danger of death or serious bodily harm. *See id.* at 11. In order to determine whether Deputy McClone's actions were "objectively reasonable," I must examine his belief that deadly force was necessary in light of the facts and circumstances confronting him. *Graham*, 490 U.S. at 397. As noted above, the parties agree on most of the events leading up to the moment that Deputy McClone entered the garage. Their disagreement is over the crucial facts concerning Weinmann's conduct just before Deputy McClone shot him.

Plaintiffs contend that Weinmann "was sitting in his chair with the shotgun across his lap resting on the wooden armrests or held just above them." (Pl. Resp. 5, ECF No. 19.) Weinmann maintains that he "never pointed the gun at Deputy McClone and he never did anything whatsoever to make Deputy McClone reasonably believe that the deputy or anyone else was in threat of harm." (*Id.*) If this is true, then Deputy McClone's use of deadly force would appear unjustified.

Defendants acknowledge that I must accept "Weinmann's testimony as undisputed for purposes of deciding their motion. (Def. Br. 5 n.2, ECF No. 17.) Despite this acknowledgment,

7

however, Defendants argue that "Deputy McClone saw Weinmann holding a shotgun which appeared to be pointed at him." (Def. Br. 5, ECF No. 17.) According to Defendants, because Deputy McClone perceived that the gun was pointed at him, he "immediately believed Weinmann was going to kill him" and "[i]n a split second, Deputy McClone was required to shift from protecting Weinmann to protecting himself and others." (*Id.* at 5, 11.) Defendants maintain that "[t]he undisputed fact is that Deputy McClone perceived that his life was in danger by virtue of the fact and the way in which Weinmann was holding his gun . . . Deputy McClone perceived that the gun was pointed at him. That fact is undisputed." (Def. Reply 2, ECF No. 26.) Based on his perception and belief, Defendants argue that Deputy McClone reasonably used deadly force to protect himself and his partner.

But of course, whether Deputy McClone perceived Weinmann to be pointing the gun at him is disputed. Weinmann's testimony summarized above, which Defendants ask the Court to accept as undisputed, means that Deputy McClone could not have perceived, or at least accurately perceived the gun being pointed at him. Deputy McClone has not suggested any reason why he would have been incapable of accurately perceiving where the gun was pointed. Indeed, he is confident that his version is correct and that Weinmann is lying. Deputy McClone characterized Weinmann's claim that he did not point the shotgun at Deputy McClone as "incorrect and a lie." (*Id.* at 23:18–21.) This is a clear factual dispute of the kind, just the type that we call upon juries to resolve.

Defendants' fall-back position is that Deputy McClone is immune from liability because he acted in good faith. "Government officials performing discretionary functions are shielded from damage liability insofar as their conduct does not violate clearly established statutory or

8

constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Although qualified immunity is a defense to a § 1983 suit, the burden of meeting the elements of this two-part test rests on the plaintiff." *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999). In order to overcome a defense of qualified immunity, the plaintiff in a § 1983 case must prove (1) that the defendant's conduct violated the plaintiff's federal statutory or constitutional rights, and (2) the right at issue was clearly established at the time of the defendant's conduct. *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001).

Here, summary judgment of qualified immunity cannot be granted for the same reason as the excessive force claim: the disputed fact regarding whether Weinmann threatened Deputy McClone with the shotgun before Deputy McClone shot Weinmann. If the facts are as Plaintiffs describe, namely that Weinmann was sitting in a chair with the long gun resting on the armrests or held just above them, he did not point the long gun at Deputy McClone, and he did not make any threatening movement or statement, Defendants are not entitled to qualified immunity. Under Plaintiffs' version of the facts, Deputy McClone employed deadly force against a suicidal individual who threatened no one but himself. A reasonable police officer on the scene would have known that it was objectively unreasonable to use deadly force against Weinmann simply because he was holding a weapon. *See Buchanan v. City of Milwaukee*, 290 F. Supp. 2d 954, 963–64 (E.D. Wis. 2003) (denying summary judgment where plaintiff maintained he pressed a knife against his own body and gave no indication he intended to throw it at the police officer).

On the other hand, if the facts are as Deputy McClone claims—Weinmann had the gun raised to his shoulder and pointed at Deputy McClone—the result would be different. *See Bell v. Irwin*, 321 F.3d 637, 639 (7th Cir. 2003) ("[I]f the suspect threatens the officer with a weapon that

risk [of serious physical harm] has been established." (internal citation and quotation marks omitted)). But as discussed above, crediting Deputy McClone's version of the incident over that put forward by Weinmann is inappropriate at summary judgment. *See Abdullahi*, 423 F.3d at 773 (citing *Anderson*, 477 U.S. at 255) ("At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party."). Accordingly, Defendants' motion for summary judgment on the excessive force claim against Deputy McClone must be denied.

### B. Monell Liability

Regardless of whether there has been a constitutional violation, Waupaca County argues that it cannot be liable under *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978). Municipalities are not liable under § 1983 unless a plaintiff proves that the constitutional violation was caused by (1) an express municipal policy; (2) a widespread, although unwritten, custom or practice; or (3) a decision by a municipal agent with "final policymaking authority." *Milestone v. City of Monroe*, 665 F.3d 774, 780 (7th Cir. 2011). Plaintiffs do not pursue any of these theories. Instead, Plaintiffs, citing *Cornfield by Lewis v. Consolidated High School Dist. No. 230*, 991 F.2d 1316, 1326 (7th Cir. 1993), assert that Waupaca County can be liable for failing to have a policy "if rules or regulations would be required to control a potentially dangerous practice." (Pl. Resp. 12, ECF No. 19.) Plaintiffs have misread *Cornfield* and their claim must be dismissed as a matter of law.

*Cornfield* did not establish that a municipality may be held liable simply because the municipality did not have a specific policy as Plaintiffs contend. Rather, the Seventh Circuit recognized that "the absence of a written policy does not wholly exempt a municipality from liability" because it did not want to "create a perverse incentive" for a municipality to "bury its head in the sand rather than acknowledge and attempt to remedy unconstitutional conduct by its employees." *Cornfield*, 991 F.2d at 1326. Thus, "the failure to make a policy itself may be actionable." *Id.* But Plaintiffs ignore the Seventh Circuit's additional explanation for what is required for this claim: "In other words, a practice of unconstitutional conduct, although lacking formal approval, may provide a basis for municipal liability. In this regard, *a single isolated incident of wrongdoing* by a non-policymaker *is generally insufficient* to establish municipal acquiescence in unconstitutional conduct." *Id.* (*Emphasis added.*)

In this case, Plaintiffs have not even alleged that there has been more than a single isolated incident of a violation of any constitutional rights during interactions between the Waupaca County Sheriff's Department and suicidal individuals. Without such an allegation, this claim would not have survived a motion to dismiss. *See id.* ("We have held that an allegation of a pattern or a series of incidents of unconstitutional conduct is required to withstand a motion to dismiss for a failure to make a policy."). Moreover, given that this is a motion for summary judgment, Plaintiffs should have come forward with evidence that could convince a trier of fact that these other alleged incidents actually occurred and established a widespread practice among deputies in Waupaca County. *See Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) ("But we have consistently held that summary judgment is 'not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to

accept its version of the events.'" (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)). They have not done so, as their brief only passingly mentions an expert report which is not in the record before the Court. (Pl. Resp. 13, ECF No. 19.) Plaintiffs' reliance on *Wallace v. Estate of Davies by Davies*, 676 N.E.2d 422 (Ind. Ct. App. 1997), is similarly misplaced because Plaintiffs have presented no evidence that Waupaca County has been deliberately indifferent to the constitutional rights of its citizens as required to make out a § 1983 claim for failure to train. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) ("We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."). Accordingly, Plaintiffs' *Monell* claim must be dismissed.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED** in part and **DENIED** in part. Defendants' motion is granted as to Plaintiffs' *Monell* claim against Waupaca County. Defendants' motion on the claim against Deputy McClone for excessive force in violation of the Fourth Amendment is denied. The Clerk is directed to set this matter on the Court's calendar for further scheduling.

Dated this   17th   day of March, 2014.

                                                   s/ William C. Griesbach
                                                   William C. Griesbach, Chief Judge
                                                   United States District Court